Attachment A

7:05 — JFK
7:05 — FCN                    5/25/04
                          DAVIS/BASSETT

          John Mehig

Sr Spanish

Do you understand your rights
as they have been explained to
you.

X  wants a lawyer

Do you wish to speak with us
now without the presence of your
lawyer

    wats a lawyer

_____        5/25/14    7:07
    Witness

Attachment B

<u>AFFIDAVIT OF SPECIAL AGENT MICHAEL PERRELLA</u>

I, Michael Perrella, having been duly sworn, do hereby depose and state as follows:

1.    I am a Special Agent with Immigration and Customs Enforcement ("ICE"), formerly the United States Immigration and Naturalization Service ("INS"), and have been so employed since May of 1996. Among other duties, I am assigned to investigate alien smuggling organizations and practices.

2. I am aware that bringing in, harboring, and transporting an alien who is present in the United States in violation of law, is a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii). [1]

3.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and agents of this agency.  This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation but is submitted in support of an application for a criminal complaint against **EDGAR JAVIER RAMOS**, d.o.b. 5/17/72, and **JOHN F. MEHIA**, d.o.b. 9/11/70, charging both with a violation of 8 U.S.C.

---

[1] 8 U.S.C.§1325(a)(1)(A)(ii) reads as follows: Any person who knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law [shall be guilty of a crime.]

§1324(a)(1)(A)(ii).

**OVERVIEW OF ALIEN SMUGGLING**

4. From my training, I know that, while no cases are alike, there are usually several different individuals and means of transportation that an alien will encounter throughout the smuggling route to reach the final destination within the United States from their home country.

5. For example, once a smuggled alien reaches the United States, the alien will usually be taken to a "safe house" or "drop house." Here, the group of aliens will wait until they can be moved either to their final destination or another "safe house." When the group is ready to be moved, they may be taken to a staging location at which point, they will meet one or more guides, also known as "coyotes", who will transport them either to another or the final location.

6. Aliens also pay, in some form or fashion, in order to be smuggled. The manner and means of payment also vary. For example, an alien may pay a sum up front while still in their home country, and pay the balance upon reaching their final destination.

**THE INSTANT OFFENSE/ENCOUNTER WITHIN THE UNITED STATES**

7. On Friday May 28th, 2004, Massachusetts Bay Transportation Authority ("MBTA")officers responded to a call for

a suspicious vehicle at the Sullivan Square Orange Line "T" stop parking lot located in Boston, MA.  A "T" inspector had noticed that the van containing a large number of individuals had been in the parking lot for several hours.  The van had a temporary license plate from Texas.

8.  When officers approached the vehicle, they observed a number of people sleeping in the back of the van.  The vehicle had a temporary vehicle registration and officers requested further information about the vehicle from the driver who was later identified as **EDGAR JAVIER RAMOS**, d.o.b. 5/17/72.  RAMOS gave the officer an envelope with vehicle information which indicated that the vehicle was recently purchased. In the same envelope, there was a list containing, among other things, names; the notation "pagado" which means "paid" in Spanish; and a destination.  A copy of the list is attached as Exhibit A. While **RAMOS** indicated that he was working for a tour company and was transporting the "passengers" from Texas to Massachusetts and other locations along the Eastern seaboard, the MBTA officer noted that none of the "passengers", five males, had any luggage. In order to determine the identity of the all of the individuals within the van, the officers transported the "passengers" to the MBTA office at Roxbury.  The officers requested that **RAMOS** and the second driver, later identified as **JOHN F. MEHIA**, d.o.b. 9/11/70, accompany them to the MBTA office. Both **RAMOS** and **MEHIA** agreed.

THE PASSENGERS/ALIENS

9. During the course of the investigation, ICE agents determined that the five "passengers" were all Brazilian nationals who recently left Brazil, traveled to Mexico, and were now present illegally in the United States. Each of the five aliens had a Brazilian passport which indicated that each recently traveled from Brazil into Mexico. Each passport had an admission stamp which indicated their entry into Mexico. None of the five aliens had a required United States visa or other form of immigration document which indicated a legal entry into the United States.

10. During the course of the investigation, the five aliens were identified as (1) Ivair Gomes DeAndrade; (2) Flavio Fernando Luis; (3) Roberto Rodriques Campos; (4) Areides Vieira Nunes and (5) Arquivaldo Gomes de Oliveria.

11. Based upon information obtained from various interviews and from documents, it was determined that each of the aliens paid or agreed to pay a sum of money in order to be smuggled into the United States. The amount of the payment ranged between $9,000 and $10,000 in United States funds. Each alien left Brazil approximately two weeks ago and ultimately arrived in Mexico City between May 14th and May 16th, 2004.

12. Each of the aliens then were smuggled across the United States/Mexico border by a person within the smuggling organization and brought to Laredo, Texas.   From Laredo, Texas, they were transported to Dallas, Texas by several different members of the smuggling organization.   Some of the aliens were hidden in the trunks of vehicles.   In Dallas, Texas, the aliens were met by **RAMOS** and **MEHIA** who were driving the van which was ultimately encountered in the Boston, MA area. Originally, there were thirteen "passengers" in the van. Eight of the passengers were dropped off at various locations, including New Jersey, and other stops within Massachusetts, during the two day trip from Dallas to the Boston area.

**INTERVIEW WITH RAMOS**

13. After being advised of his rights in his native language, and after agreeing to waive those rights, RAMOS spoke with investigators. A summary of the information provided by RAMOS is as follows: He admitted that he and MEHIA were paid to drive the vehicle in question and its passengers from Dallas, Texas to New Jersey, Massachusetts, and North Carolina. He identified his bosses as "Alfonso" LNU and "Carlos" LNU.   RAMOS indicated that he has made at least six other trips of the same type, transporting approximately the same number of persons each time.   He admitted that the "passengers" do not have tickets, do

not have luggage, and are not permitted to leave until they pay.
If a passenger did not provide the money at the point of the
final destination, RAMOS stated that he would call "Carlos" and
await permission from "Carlos" to release the alien. RAMOS
indicated that he would be paid upon his return to Texas and
would receive $525.00 upon his return. (None of the "passengers"
ever returned with him back to the Texas area.) RAMOS was
responsible for collection of the remaining balances from the
aliens if they had not already paid in full. Normally, he would
collect $500 per alien and provide this money to his bosses.
During these prior trips, he had information from the persons
that he was transporting that they entered the United States
illegally. He was transporting them to the interior of the United
States to their final destination.  The information he previously
obtained during these trips including specific details regarding
how the aliens were smuggled into the United States and how much
they were paying to be smuggled into the United States.

14. With respect to this most recent trip, RAMOS claimed
that he did not know that the aliens were illegally present in
the United States when he first encountered them in Dallas.
However, during the trip, he spoke with several of the aliens
that he was transporting.  During these conversations, RAMOS
determined that the aliens were from Brazil.  The aliens told

him, among other things, the amount of money they were paying to be smuggled into the United States; that they had only been in the United States a short time after being smuggled in from Mexico; their means of travel; and how they remained undetected by various immigration authorities while they were being smuggled into the United States.

**INTERVIEW WITH MEHIA**

15. After being advised of his rights in his native language, MEHIA agreed to waive those rights and speak with ICE investigators. A summary of the information provided by MEHIA is as follows: He was a driver with RAMOS and that he would be paid $500 upon his return to Dallas by Alfonso. (None of the passengers were returning to the Dallas, Texas area). This was the fourth trip he made; in each of the prior trips, he transported approximately twelve persons per trip. During all of the prior trips, almost all of the passengers that he transported were from Brazil, and the trip always included Massachusetts as the final destination.

16. MEHIA claimed that he was unsure if the passengers were illegally present, although he thought it was odd that none of the passengers had any luggage or other change of clothes. He said he never asked "Alfonso" the status of the passengers because he thought they were, in fact, illegal, and did not want

to lose his job if he asked about their status. In this particular case, prior to making the trip, he stated that he was told his passengers were at a "house."

**CONCLUSION**

Based on the foregoing information, I believe probable cause exists to conclude that **EDGAR JAVIER RAMOS**, d.o.b. 5/17/72, and **JOHN F. MEHIA**, d.o.b. 9/11/70, did, knowing or in reckless disregard of the fact that an alien has come to, entered, and remains in the Untied States in violation of law, transported or moved or attempted to transport or move such alien or aliens within the Untied States by means of transportation or otherwise, in furtherance of such violation of law, in violation of 8 U.S.C. §1324(a)(1)(A)(ii).

_____
Michael Perrella
Special Agent
United States Immigration
and Customs Enforcement


Subscribed and sworn to before me this 30ᵗʰ day of May, 2004


_____
JOYCE LONDON ALEXANDER
UNITED STATES MAGISTRATE JUDGE

(203) 796 5467. 500
Exit-5





Date : May 26 / 2004

500
Antoni
20394
Denvur.

# OXFORD TOURS

## TRANSFERS SERVICE

Adalto

| | SALIDA DE DALLAS / TEXAS | | | |
|---|---|---|---|---|
| | PASAJERO | PRECIO | TEL./CONTACTO | DESTINO |
| 01 | Arquivaldo Gomez/Milton | 50 | 781-913.9511 Renato | Somerville/MA |
| 02 | Valdeci Silva/Milton | | 781-913.9511 Renato | Somerville/MA |
| 03 | Joao Paiva/Milton | Pagado | 781-913.9511 Renato | Somerville/MA |
| 04 | Flavio Silveira/Milton | Pagado | 973-466.1173 Wallace | Newark/NJ |
| 05 | Wanderson Goncalves/Regis | 200,00 | 617-678.1148 Adalto | Somerville/MA |
| 06 | Jose Pereira/Regis | Pagado | 617-678.1148 Adalto | Somerville/MA |
| 07 | Renato Santos/Regis | Pagado | 617-678.1148 Adalto | Somerville/MA |
| 08 | Marcos Lopes/Regis | Pagado | 617-678.1148 Adalto | Somerville/MA |
| 09 | Ivair Andrade/Wanderson | Pagado | 704-566.8177 Geraldo | Charlotte/N.Carolina |
| 10 | Roberto Campos/Hermes | P. | 508-395.0359 Daniel | Framingham/MA |
| 11 | Areides Nunes/Hermes | Pa 70,00 | 508-879.1810 Luzinete | Framingham/MA |
| 12 | Flavio Luis/Hermes | P. | 978-740.4669 Ediel 978-977.2732 | Peabody/MA |
| 13 | Thiago Costa/LuisEdivalso | 70,00 | 973-589.4732 Daniel 973-477.7659 Daniel | Newark/NJ |

Valor Cobrado   :
Chofer          : Edgar   Telf. : 214-642.0729
Chofer          : John Mehia
Camioneta       : Chevrolet  Placa :
Salida Millas   :
Llegada Millas  :
Adelanto        :   $ 300,00

2 - 3 - 4

Adalto = 1000

2 = 301 946 0018 · WDC.

5678 } Renato. 2000

" Exhibit A "

# Attachment C

