```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA       )
                               )
          v.                   )   CRIMINAL NO.04-10198-MLW
                               )
EDGAR RAMOS                    )
JOHN MEHIA
```

### GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through Assistant United States Attorney Nadine Pellegrini, respectfully submits this trial brief in the above-captioned case. This brief outlines the facts to be presented at trial and the charges pending against the defendants. It also highlights the more significant evidentiary issues that will arise during the trial.

### Statement of Facts

On Friday May 28th, 2004, the day before the Memorial Holiday weekend, Massachusetts Bay Transportation Authority ("MBTA")officers responded to a call for a suspicious vehicle at the Sullivan Square Orange Line "T" stop parking lot located in Boston, MA. A "T" inspector reported that the van containing a large number of individuals had been in the parking lot for several hours. The van had a temporary license plate from Texas.

When officers approached the parked vehicle, they observed what appeared to be a number of people sleeping in the back of the van. The vehicle had a temporary vehicle registration. The officers requested further information about the vehicle from the

driver who was later identified as RAMOS. The two officers could see movement of other persons in the van but, due to the tinted windows, could not determine exactly what those persons were doing. Given the concern for the safety of both officers, one of the officers opened the van's side door. The officers requested identification of the passengers. The passengers provided Brazilian passports with no indication that the holders were legally present in the United States. RAMOS gave the officer an envelope with vehicle information which indicated that the vehicle was recently purchased. In the same envelope, there was a list containing, among other things, names; the notation "pagado" which means "paid" in Spanish; and a destination. While RAMOS indicated that he was working for a tour company and was transporting the "passengers" from Texas to Massachusetts and other locations along the Eastern seaboard, the MBTA officer noted that none of the "passengers", five males, had any luggage. In order to determine the identity of all of the individuals within the van and to determine whether the "passengers" were, in fact, legally within the United States, the officers transported the "passengers" to the MBTA office at Roxbury to await the arrival of ICE agents. The officers requested that RAMOS and the second driver, later identified as Defendant MEHIA, to accompany them to the MBTA office. Both RAMOS and MEHIA agreed.

An ICE agent responded to the MBTA offices and reviewed the passports provided by the "passengers." The ICE agent noted

that the Brazilian passports had entry stamps into Mexico. However, none of the five aliens being transported had the required United States visa or other form of immigration document which indicated a legal entry into the United States.

*SYNOPSIS of RAMOS STATEMENT*

At the MBTA station, after ICE agents arrived, RAMOS was advised, in his native language of the reasons he was being detained. He was not asked any questions at this time. Subsequently, RAMOS was advised of his rights in his native language. RAMOS provided some basic biographical information and indicated that we was offered a job as a driver. He further indicated that he made approximately six trips and that this was his sixth trip for the person who hired him who he identified as "Alfonso" LNU.  RAMOS indicated that he would drive from Dallas with a number of passengers and drop those passengers off at various cities throughout the United States, mainly in the Midwest and along the East Coast. RAMOS indicated that he was paid in cash by either "Alfonso" LNU or "Carlos" LNU.  He was also paid by check for two other trip and was reimbursed for gas and tolls incurred along the trip.  RAMOS stated that it was his job to collect money from the passengers. Some passengers paid in full while others had outstanding amounts to be paid.  RAMOS was given a list of the passengers and contact information, including names and phone numbers, for some of the passengers.

RAMOS stated that on prior trips, he would meet an

individual by the name of "Mecca" or Carmecca" who would be with the passengers. They would meet at a gas station or a similar type of location. RAMOS's co-driver was not always the same person.  During the past trips, RAMOS indicated that he transported people from Mexico, Guatemala, El Salvador and Boliva. These persons had advised RAMOS that they were smuggled into the United States. They also told him much they paid to be smuggled into the United States.

RAMOS indicated that during this trip he initially picked up 13 passengers. He indicated that he did not know the nationalities of the passengers or if they were illegally present in the United States. However, during the trip, he indicated that he realized the passengers were not Spanish speakers and that they were from Brazil.  RAMOS stated that, although the passengers were not Spanish speaking, he and they could communicate with each other. RAMOS stated that the passengers explained that they flew from Brazil to Mexico and were transported through Mexico in a tractor trailer.  They crossed the U.S.- Mexican border on foot.  The passengers indicated that they paid $10,000 to be smuggled.

RAMOS identified a picture of co-defendant MEHIA indicating that he was the co-driver but that RAMOS knew MEHIA as "Fernando."

RAMOS indicated that he left Dallas, Texas on May 26th and had already driven to various locations and had already dropped

off other individuals prior to coming to Massachusetts.

*SYNOPSIS of MEHIA STATEMENT*

Defendant MEHIA admitted that he was also working for "Alfonso" LNU and had made four trips, including this one. MEHIA indicated he was paid approximately $500 per trip. MEHIA indicated that he was a co-driver and they changed drivers approximately every six hours or so. The passengers did not drive. Alfonso paid for the gas and the tolls. MEHIA indicated that he thought the passengers were "o.k." because they had passports. MEHIA indicated further that all the passengers on this trip were from Brazil. MEHIA then indicated that he was not sure if the passengers were legal or not because if, they were legal, it would be easier and faster to come to Massachusetts on a plane. MEHIA did not know how much each passenger paid for the trip but that none of the passengers had any suitcases and only one change of clothes. That was, according to MEHIA, not "normal" and that was another reason he thought the passengers may not be legal.

**THE CHARGE**
**8 U.S.C. § 1324(a)(1)(A)(ii)**
**TRANSPORT OF ILLEGAL ALIENS**

The Grand Jury charges:

Beginning on or about May 26, 2004, in the District of Massachusetts and elsewhere,

**EDGAR RAMOS and JOHN MEHIA,**

the defendants herein, knowing and in reckless disregard of the

fact that aliens, had come to, entered and remained in the United States in violation of law, transported and moved such aliens within the United States by means of transportation and otherwise, in furtherance of such violation of law and in furtherance of private financial gain.

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii); Title 8, United States Code, Section 1324(a)(1)(B)(i), and Title 18, United States Code, Section 2.

## EVIDENTIARY ISSUES

At the time of this filing, the court has not yet issued its final order regarding the issue of suppression of the vehicle or the suppression of the statements of defendant RAMOS.[1]

With respect to other issues which may arise during the course of the trial, the United States must prove that the transported alien is an alien who has come to, entered, or remains in the United States in violation of law.  See United States v. Guerra-Garcia, 336 F.3d 19 (1st Cir. 2003); United States v. Diaz, 936 F.2d 786 (5th Cir. 1991); United States v. Barajas- Montiel, 185 F.3d 947 (9th Cir. 1999); 8 U.S.C. 1324(a)(1). The prosecution need only establish one of the elements relating to the alien's illegal entry or presence. United States v. Esparza, 882 F.2d 143 (5th Cir. 1989). Also, it is not necessary to identify the illegal alien by name. United

---

[1] Defendant MEHIA failed to raise a claim regarding the voluntariness of the statement.

States v. Powell, 498 F.2d 890, 892 (9th Cir. 1972).

In this case, the government does not, at this time, expect to call any of the aliens who were present in the vehicle on the date in question.  The government expects that it will present the foreign passports of each of the alien individuals which were collected from each individual by ICE agents on the date in question. Each passport shows an entry stamp into Mexico, corroborating in turn, the statement of defendant RAMOS, and each passport does *not* have the required visa from Brazil into the United States which would show proof of legal entry. It is the position of the government that foreign passports and other identity documents issued by foreign governments come within the public records exception and provide substantial evidence of alienage in the absence of testimony by illegal aliens themselves. See United States v. Pluta, 176 F.3d 43 (2d Cir. 1999).

                                      Respectfully submitted,

                                      MICHAEL J. SULLIVAN
                                      United States Attorney

                          By:   /s/Nadine Pellegrini
                               Nadine Pellegrini
                               Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

                                    /s/Nadine Pellegrini
                                    Nadine Pellegrini
                                    Assistant United States Attorney

Date: August 11, 2008